UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, THE WILDERNESS SOCIETY, EARTHWORKS, FRIENDS OF THE CLEARWATER, WILDERNESS WATCH,<br><br>        Plaintiffs,<br><br>    v.<br><br>LANNOM, KEITH B., Payette National Forest Supervisor, and U.S. FOREST SERVICE,<br><br>        Defendants. | Case No.  1:15-cv-246-BLW<br><br>**MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment filed by plaintiffs, defendants, and intervenors.  The Court heard oral argument on June 14, 2016, and took the motions under advisement.  For the reasons explained below, the Court will grant in part and deny in part each of the motions.

## SUMMARY

This case examines how much mining should be allowed in a wilderness area. Specifically, the Court is reviewing the Forest Service's decision to allow drilling, road reconstruction, and the use of motorized vehicles and heavy equipment at the Golden Hand Mine in the Frank Church - River of No Return Wilderness Area.

Mining on federal lands is governed by the 1872 Mining Law.  It declares that "all valuable mineral deposits" on federal lands are "free and open to exploration and purchase."  Nearly 100 years later, Congress passed the Wilderness Act for the purpose of setting aside federal lands "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain."  The Frank Church Wilderness was created pursuant to the Wilderness Act.

The conflict between these laws is obvious – mining will never be compatible with wilderness.  Yet Congress has decreed that they must co-exist at times.  The proponents of the Wilderness Act could not convince Congress to completely ban all mining in wilderness areas.  Instead, a compromise was reached that allowed valid mining claims made prior to wilderness designation to continue.

The Golden Hand mine was discovered in 1889.  It has not been worked for decades, but its current owner – AIMMCO – wants to reopen it to search for gold and silver.  Before it can do so, however, AIMMCO must first prove to the Interior Department that it has valid mining claims on the mine.  To prove validity, AIMMCO must show that the claims contain a marketable amount of mineral.  And to obtain the necessary proof, AIMMCO must be allowed to do assessment work including some drilling, trenching, and road reconstruction.

AIMMCO submitted a plan to do that assessment work, and the Forest Service has approved certain aspects of that plan.  The plaintiffs challenge that approval, claiming that the Forest Service favored mineral extraction over wilderness protection.

In this decision, the Court holds that the Forest Service did not reveal its analysis in reaching some conclusions, may have relied on information provided in confidence not available to the public for review, and made an error in reaching one conclusion that might have affected the result. The Court will declare the Forest Service's approval of AIMMCO's mining plan to be invalid, and will remand the matter back to the Forest Service to correct these errors.

## LITIGATION BACKGROUND

This suit concerns two lode mining claims located in the Payette National Forest within the boundaries of the Frank Church - River of No Return Wilderness. The plaintiffs challenge the Forest Service's decision to authorize assessment work on two mining claims – the Golden Hand Claims 1 & 2 – owned by American Independence Mines and Minerals Co (AIMMCO). The project approved by the Forest Service authorizes AIMMCO to collect subsurface geological information in preparation for a new validity hearing on these two mining claims in the Wilderness Area.

The two claims were discovered near the turn of the century by James M. Hand. Early on, an adit – a horizontal tunnel – was dug on Claim 1, and became known as the Ella Portal. The entrance to this tunnel later collapsed in the 1920s or early 1930s. In 1934, a prominent Idaho mining geologist, Robert N. Bell, studied the Golden Hand claims and prepared a report examining the potential for mining valuable minerals on the claims. In that report, Bell recounted statements Hand made to him about the gold taken out of the tunnel. On the basis of those statements, and his studies, Bell concluded that "serious attention" should be given to renewed mining at the Ella Portal.

A year later, in 1935, Bell took 40 samples from the Ella Portal tunnel that "amply confirm[ed] my . . . forecast . . . of a definite prospect of a mass production ore deposit." There is no record, however, of any further mining being done in the Ella Portal, and the tunnel's entrance remains blocked to this day.  No production on any of the Golden Hand claims has been reported since 1941.

AIMMCO's ownership[1] of these two claims is affected by the Wilderness Act, passed by Congress in 1964.  That Act was designed to set aside federal lands as "wilderness areas" that would be "untrammeled by man, where man himself is a visitor who does not remain."  See 16 U.S.C. § 1131(c).  Under the Act, Congress would designate federal lands for inclusion in the National Wilderness Preservation System.  In 1980, Congress designated as wilderness the land in central Idaho that would become the Frank Church – River of No Return Wilderness.  The Golden Hand Mine was located in this wilderness area.

One effect of this designation would be that as of January 1, 1984, mining would be prohibited "[s]ubject to valid rights then existing."  *See* 16 U.S.C. § 1133(d)(3).  This meant that as of January 1, 1984, AIMMCO's right to mine the Golden Hand claims would be restricted to any valid rights it had prior to that date.

For each of the years from 1981 through 1983, AIMMCO submitted Plans of Operation that were approved by the Forest Service.  In February of 1984, AIMMCO advised the Forest Service that its plan of operations would be the same as the year

---

[1] Over the years, various entities owned these claims, including AIMMCO (a joint venture) and AIMMCO (an LLC – the current owner).  For ease of reference, the Court will simply refer to the owner as AIMMCO.

before.  This time, the Forest Service refused to approve the plan until a field inspection could be completed.  A field inspection by Forest Service personnel was done and a report filed in August of 1984, concluding that the claims were valid.  The Forest Service rejected that report, however, and another was done in 1986 concluding that the claims were not valid.

On the basis of that study, the Forest Service commenced a validity contest on February 25, 1987.  In response, AIMMCO submitted its 1987 Assessment Work Request to the Forest Service, seeking approval to do appraisal work on the claims to support its claim of validity.  *See* FS031217-19

In that 1987 Assessment Work Request, AIMMCO proposed on Claim 1 to use hand labor to clear the entry to the Ella Portal.  On Claim 2, AIMMCO proposed mapping, sampling, trenching, and drilling to confirm the existence of mineral-bearing xenolith.  This work, the Request noted, "will require the construction of access roads and preparation of drill sites."  *Id.* at FS031218.

The Request was only three pages in length and quite general in its proposals.  It failed to (1) identify the length of the proposed roads, (2) the number of the proposed trenches and drill sites, (3) the duration of the surface-disturbing activities, or (4) any mitigation measures.  The Request did note that AIMMCO wanted to use existing buildings on the site "for temporary living quarters of its crew during the time the work described above is being conducted."  *See FS031218.*

Acting on the Request, the Forest Service permitted only the non-surface disturbing proposals, and thus allowed only the mapping and sampling proposals on

Claim 2.  All other proposals were denied as inconsistent with the Wilderness Act.

AIMMCO appealed this denial, but it was affirmed by the Forest Service Supervisor and

by the Regional Forester.

AIMMCO responded by filing suit in this Court to stay the validity contest until

AIMMCO could do assessment work that would support the validity of the claims.  *See*

*AIMMCO v. United States,* Civil No. 88-1250.  The parties reached an agreement to stay

that litigation and proceed with the validity determination.

The validity determination then proceeded to a hearing before Administrative Law

Judge Ramon M. Child, and ultimately a decision on January 19, 1989.  Judge Child

found that AIMMCO had made a discovery of a valuable deposit on Claim 2 "but failed

to so prove with respect to Claim 1."  Judge Child found that the only evidence of

exposure of mineral on claim 1 "consists of samples taken from the dump outside of the

caved-in Ella Portal."  Judge Child made no mention of the 1935 report by geologist Bell

that analyzed samples taken from within the Ella Portal tunnel.  Focusing only on the

dump samples, Judge Child found no evidence to fix their origin, and thus refused to

attribute any mineral found in the dump to the Ella Portal.  He concluded that "there is a

failure of proof of an exposure of mineral in place within the boundaries of Claim

number 1."

The parties appealed Judge Child's decision to the Interior Board of Land Appeals

(IBLA), which rendered a decision on February 10, 1992.  The IBLA affirmed Judge

Child's decision that Claim 1 was invalid, but reversed his decision that Claim 2 was

valid.  With regard to Claim 1, the IBLA found that Judge Child's decision "was clearly

correct because the presumed situs of mineralization, the Ella Portal, had been caved in for years.  Exposure of a vein or lode carrying mineral values in place is a necessary precondition to the validity of a lode claim."

With regard to Claim 2, the IBLA reviewed the record and found only a few samples from the claim that revealed nothing about the existence of a valuable mineral deposit.  AIMMCO responded that it had been unfairly precluded from collecting samples when the Forest Service denied its 1987 request to do assessment work.  The IBLA rejected this assertion:

> The record is clear that [William] Vanderwall [AIMMCO's engineering expert] had the same chance to sample claim 2 as he did other Golden Hand claims.  Prior to December 31, 1983, nothing prevented [AIMMCO] from exposing sufficient mineralization on claim 2 from which reserve calculations might be made.  The record suggests rather that [AIMMCO] had found little of interest on this claim to cause it to sample.

The IBLA went on to find that the lack of data on tonnage and grade of ore on Claim 2 required it to speculate about the profitability of mining that claim.  Refusing to so speculate, the IBLA held that "[a]ssuming that mineralization has been shown on Claim 2, [AIMMCO] has not shown the presence of a valuable mineral deposit."

AIMMCO appealed that decision to this Court in *AIMMCO v. United States, Civil No. 00-291-S-BLW*.  In ruling on that appeal, this Court held that with regard to Claim 1, the IBLA improperly ignored important evidence.  Because the law required AIMMCO to show that there was mineral exposure on Claim 1 prior to December 31, 1983, the IBLA should have considered the evidence of Bell's 40 samples, taken in 1935 from within the Ella Portal tunnel.  The Court held that

[b]y ignoring evidence of a prior exposure, the IBLA took a position that is contrary to law.  The Court therefore reverses the IBLA's decision finding claim 1 invalid because there was no present exposure.  The Court remands the validity determination as to claim 1 to the Department of Interior for a rehearing to determine whether AIMMCO's claim 1 is valid under the authority discussed above.

With regard to Claim 2, the Court was concerned that AIMMCO had been blocked by the Forest Service from doing the assessment work needed to prepare for its validity hearing, and that the lack of that assessment work had been relied on by the IBLA in denying the validity of Claim 2.  The Court found that this violated the legal right that AIMMCO had to do assessment work to prepare for the validity hearing: "AIMMCO must be allowed a fair opportunity to prove the validity of its claims."  Accordingly, the Court reversed the IBLA's decision on Claim 2 and remanded it to the Department of the Interior for a rehearing on whether AIMMCO satisfied the marketability test, after AIMMCO had been given an opportunity to do assessment work by the Forest Service.

On that last point, the Court directed the Forest Service to recognize AIMMCO's right to prepare for a validity hearing.  At the same time, the Court recognized the Forest Service's duty to consider environmental regulations.  The Court urged AIMMCO and the Forest Service to reach an agreed-upon result that would allow AIMMCO to prepare for its hearing and recognize the applicability of environmental restrictions:

> To reach that balance, both sides must give way.  AIMMCO must reduce the scope of its surface disturbing proposals, focus only on work that is necessary to support validity, and propose mitigation and protective measures.  The Forest Service must recognize AIMMCO's right to prepare for the validity hearing, and allow work to that end, while requiring adherence to all applicable rules and regulations.

Following the remand, AIMMCO spent several field seasons gathering samples on the Claims to determine the extent of mineralization. Based on that sampling, AIMMCO issued a new mining plan in August of 2007. *See* FS6154-58. It proposed 13 drill pads from which 13 to 18 core holes would be drilled. It also called for an unspecified number of trenches, and the construction of a bunkhouse and camp on the site to house workers. *Id.*

To discuss this new plan, Forest Service representatives and AIMMCO geologists held a meeting in Twin Falls Idaho on March 18, 2009. There is, however, nothing in the record describing what was discussed there beyond a one-sentence summary by each party. AMMICO states that it "presented confidential and proprietary results from its geochemical sampling, which provided further evidence of the existence and location of the inferred mineralized bodies extending through Claims 1 and 2." *See AIMMCO's Statement of Undisputed Facts (Dkt. No. 24-2)* at ¶ 21. According to the Forest Service's account of the meeting, AIMMCO "presented a summary of geologic mapping and geochemical anomalies it has detected mostly through recently collected soil samples near the northeast corner of claim 2 and the east half of claim 1." *See FS6548.*

Whatever justifications AIMMCO presented at that confidential meeting were not sufficient for the Forest Service. About a month after the meeting, Forest Service District Ranger Joe Harper wrote a letter to AIMMCO telling them that their Twin Falls presentation failed to identify the need for each drill pad. *See FS6547-49.* Harper explained that when his team gathered after the meeting to compare notes, they could not "identify the preexisting exposures AIMMCO intends to confirm . . . and how the

proposed drilling is tied to these exposures." *See FS6548.* Harper asked for "a map showing the preexisting exposures, a description of the exposures, and a narrative explanation of how AIMMCO's proposed work is intended to confirm and corroborate these preexisting physical exposures." *Id.* In addition to this request, Harper asked AIMMCO to answer eight specific questions designed to identify how each drill site related to a pre-existing exposure. *Id.* AIMMCO answered those eight questions in a letter dated June 11, 2009. *See FS34487-94.*

About two months later, the Forest Service thanked AIMMCO for its answers to the eight questions and asked for their "updated plan of operations as we discussed in our meetings." *See FS6550.* AIMMCO provided that updated plan in January of 2010. *See FS6475-82.* At the request of the Forest Service, AIMMCO reduced the drilling sites from 13 to 11. *Id.* AIMMCO also decided not to proceed to mine Claims 3 and 4 in order to "mitigate potential impact[s] . . . ." *Id.* at FS6476.

The Forest Service reviewed the January 2010 plan and asked AIMMCO for more information. *See FS6552.* For example, the Forest Service asked AIMMCO (1) to identify the ingredients in the drilling fluid and how it would be contained; (2) to describe the work shifts; and (3) to describe more specifically the estimate of vehicle trips to and from the drill sites. *See FS6552-59.* AIMMCO answered by identifying the drilling fluid ingredients, explaining that the fluid would be contained in 4,000-gallon sump pits lined with plastic, to be placed in the existing road bed for each drill pad, and specifying that drilling will be conducted by one drilling rig on a 24-hour basis using two crews on 12 hour shifts. *See FS6378-85.*

**Memorandum Decision – Page 10**

During another meeting in October of 2010, the Forest Service asked AIMMCO to consider housing the drilling crews at a site outside the wilderness instead of on the Claim sites.  *See* FS6561.  AIMMCO agreed and revised its plan accordingly.  *Id.*

In 2012, the Forest Service prepared a draft EIS for public comment.  *See* FS81963.  After reviewing the public comments, the Forest Service issued its Final Environmental Impact Statement (FEIS) in December of 2014, and a Record of Decision (ROD) in July of 2015.

The ROD authorizes AIMMCO to conduct mineral confirmation activities inside the Frank Church Wilderness to prepare for validity hearings for Claims 1 and 2.  *See* FS81956–57.  These assessment activities would occur over 3 field seasons, which typically last four months per year during July through October.  *See* FS81978.  The ROD authorizes AIMMCO to use a bulldozer and other motorized earth-moving equipment, drill rigs, and other machinery within the Wilderness to (1) reconstruct 4 miles of road, (2) construct up to 11 drill pads, each 20 by 20 feet, (3) drill up to 18 holes, (4) construct for each drill pad a 4,000-gallon mud pit to hold drilling fluid, (5) excavate three pit trenches (6 feet wide/15 feet long/10 feet deep) down to bedrock, and (5) reopen the Ella Portal with a motorized excavator.  *See* FS81972–76.  To transport work crews and equipment to the mine site, AIMMCO may use large pickup trucks and other motor vehicles to drive 3 miles into the Wilderness, and back out, 571 times each field season.  *See* FS80435.

To mitigate the impacts, no new roads will be constructed – all roads will be reconstructed on existing roadbeds.  *See* FS80436-37.  Likewise, all drill pads and

trenches will be constructed on existing roadbeds to minimize new disturbances. *See* FS6477, 6479.  AIMMCO will also engage in extensive monitoring to assess impacts on water quality, fisheries, soil, and wildlife.  *See* FS81991-97.

Ultimately, however, the mitigation measures do little to reduce the harm to wilderness values, as the ROD recognized:

> The wilderness user will see physical impacts to the land, motorized and mechanized equipment, and hear noise and could see dust from these machines from July to November for up to 3 years. This type and amount of development will adversely affect the Wilderness users' sense of solitude and remoteness and enjoyment of a primitive recreation experience in the Beaver Creek and Hand (Coin) Creek drainages, and the surrounding ridge tops that encompass the project area. The actual use and the knowledge of these activities will adversely impact the Wilderness character by compromising the natural integrity and untrammeled conditions of the [Frank Church] Wilderness.

*See* FS081960.

## LEGAL STANDARDS

Under the Administrative Procedures Act (APA), the Court must determine whether the Forest Service's decision was "arbitrary, capricious, not supported by substantial evidence, or contrary to law."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

(1983).  The court may not substitute its judgment for that of the agency.  *Natural Resources Defense Council, Inc. v. Hodel,* 819 F.2d 927, 929 (9th Cir.1987).

To determine whether the Forest Service acted arbitrarily, the Court must consider whether it followed the various laws governing its decision.  That was no easy task.  AIMMCO's right to mine is governed by two different agencies.  The Forest Service regulates surface rights in the National Forest where the claims are located, and the Interior Department regulates mineral rights.  While the Interior Department ultimately determines whether AIMMCO's mining claims are valid, the Forest Service determines the scope of work on the ground.

It is the Forest Service that the Court focuses on here, and its decisions are governed by five different federal laws: (1) Mining Law of 1872; (2) National Environmental Protection Act (NEPA); (3) Organic Act; (4) National Forest Management Act (NFMA); and (5) Wilderness Act of 1964.

Under the Mining Law of 1872, and this Court's prior decision, AIMMCO is entitled to gather sufficient evidence to make its case that (1) there was a discovery of a pre-existing exposure of minerals before the creation of the wilderness area[2]; and (2) the two claims contain a "valuable mineral deposit" under the "prudent-man test." *U.S. v. Coleman,* 390 U.S. 599, 602 (1968).  AIMMCO's task in a validity hearing will be to show that it has discovered a mineral deposit that is of sufficient quality and quantity to

---

[2] *See* FS34490 (letter dated June 11, 2009, wherein AIMMCO states that it "understands that the evidence it develops as a result of its plan will be admissible only to show whether a valid discovery was made before the creation of the Frank Church Wilderness."

justify further expenditure on its development.  Because the majority of the deposit is underground, AIMMCO must use drilling and trenching to delineate the mineral deposit, to determine the width and depth of the ore-bearing material, and to determine the quality of the mineral deposit.  *See* FS34491-92.  Not only must AIMMCO show the quality and extent of the ore body, it must make reasonable estimates of the costs to mine and recover locatable minerals.  AIMMCO therefore needs sufficient information to evaluate potential mining methods and costs.

But AIMMCO's mining is not unrestricted.  It must be conducted "in a manner compatible with the preservation of the wilderness environment" to comply with the Wilderness Act of 1964.  *See* 16 U.S.C. § 1133(d)(2).  That "wilderness environment" is defined as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain."  *See* 16 U.S.C. § 1131(c).  The mining is also regulated by the Organic Act and its authorized regulations that require mining to "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources," including air, water, fisheries, and scenic values.  *See* 36 C.F.R. § 228.8.  And to be consistent with NFMA, the mining must adhere to the Management Plan for the Frank Church Wilderness, which allows "reasonable access" only for "essential" use of "valid mineral claims established before December 31, 1983."  S*ee* FS3374; 16 U.S.C. § 1604(i).  Finally, NEPA requires transparency in the evaluation process – the Forest Service's evaluation of AIMMCO's mining project must be "available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

**Memorandum Decision – Page 14**

## ANALYSIS

### Effect of 2002 Court Decision

The plaintiffs argue that the Forest Service ignored the fact that the Court's 2002 decision treats the 1987 Assessment Work Letter as a baseline from which AIMMCO had to retreat in negotiating the scope of assessment work with the Forest Service. The Court disagrees. The 1987 Assessment Work Letter contained none of the detail necessary to serve as such a baseline. While the Letter proposed drilling, trenching and road building, it failed to identify or discuss (1) the length of the proposed roads, (2) the number of the proposed trenches and drill sites, (3) the duration of the surface-disturbing activities, or (4) any mitigation measures. Having nothing concrete to work with, the Court could not – and did not – hold that the 1987 letter set a baseline for assessment work from which AIMMCO had to retreat. Instead the Court was simply urging both parties to compromise to reach an agreement. In other words, we start here with a blank slate, and the Forest Service properly interpreted the Court's decision on this point.

### Drilling, Trenching & Roads

The Forest Service has no easy task here. It must balance mineral extraction with wilderness protection. To comply with the duties imposed on it by the statutes discussed above, the Forest Service must assess the minimum activity necessary for AIMMCO to prepare for its validity hearing. The Payette Forest Supervisor Keith Lannom recognized this very duty in the ROD when he concluded that "[m]y decision will impact the Wilderness character . . . but has been determined to be the *minimum necessary* . . . considering the [mining] rights in the project area . . . ." *See* FS81960 (emphasis added).

To reach this conclusion, the Forest Service must first understand AIMMCO's justification for each drill pad, each trench, each road, and each vehicle trip.  The Forest Service must ask:  How will each activity help AIMMCO prove validity?  Once the agency understands the answer to that question, it must then evaluate whether alternatives are available that would reduce impacts but still allow AIMMCO to prepare for its hearing.  To do this, the Forest Service is entitled to ask hard questions and get straight answers.  And its evaluation of those answers must be fully documented so that it can be reviewed by the public.

The Forest Service followed this process in evaluating AIMMCO's mining plan for two claims (Claims 3 & 4) that adjoin Claims 1 & 2.[3]  While that evaluation is not before the Court for review, it is contained in this administrative record and provides an instructive example of a thorough agency review.

In that evaluation for Claims 3 & 4, the Forest Service issued a twenty-nine-page report – titled Surface Use Analysis – prepared by its own Certified Mineral Examiners. *See* FS16362-91.  This analysis evaluated AIMMCO's justification for every proposed drill site and trench.  It examined the necessity for the full number of drill sites and trenches, their relation to pre-existing exposure of minerals, and the availability of less-invasive alternatives.  It concluded that AIMMCO failed to link 20 of the 31 drilling sites to any mineralization, and that many of the drill sites appeared to be nothing more than "pure wildcat exploration."  *See* FS16388.  It identified a less invasive alternative where

---

[3] Claim 3 adjoins the southern boundary of Claim 2 while Claim 4 abuts the southeastern boundary of Claim 2.  *See* FS6482.

drilling would be sequenced, allowing AIMMCO to "verify first and extend second." *See* FS16388.  Under this alternative, AIMMCO would start with half as many drill sites and then review the results to determine if drilling should be extended further. *Id.* The analysis also concluded that all trenching should be deferred until drilling verifies deposits. *Id.* at FS16390.

The Court is not suggesting that the same conclusions apply to Claims 1 & 2. Rather, it is the *process,* not the *result*, of the Surface Use Analysis for Claims 3 & 4 that merits close attention.  That process reviewed AIMMCO's justifications for each part of its mining plan, evaluated less-invasive alternatives, proposed a plan that wove together environmental protections with AIMMCO's right to mine, and accomplished all this in a detailed analysis that could be reviewed by the public.  That is the process compelled by the welter of statutory directives – the Mining Act, Wilderness Act, Organic Act, NFMA, & NEPA – that govern the Forest Service.

Was the same process employed for Claims 1 & 2?  There is a Surface Use Analysis for Claims 1 & 2, *see* FS16671-74, but it contains a conclusion rather than analysis: "The information that will be obtained from AIMMCO's proposal is needed by both the company and Forest Service to verify valid existing rights for the subject claims. AIMMCO and the Forest have limited the scope of the proposal to minimize the surface disturbance and still gain the required mineral resource information." *Id.* at FS16674.

There is a similar conclusion-without-analysis in the Minimum Requirements Decision Guide (accompanying the EIS): "Alternative C is identified (selected) as the recommended course of action because it reduces the negative impacts to wilderness

character to the greatest possible extent while complying with the legal mandate to authorize activities reasonably incident to mineral development on valid claims." See FS17739.

How did the Forest Service reach these conclusions? Why does AIMMCO's plan require 11 drill sites, 3 trenches, and 4 miles of reconstructed roads? Could AIMMCO get by with less? If not, why not? The Forest Service did not answer these questions in the Surface Use Analysis. To find answers – that is, to obtain the transparent analysis that the statutes require – the reader must look elsewhere.

But there is no other source. Neither the FEIS nor the ROD analyze AIMMCO's proposed drill sites, trenches, and miles of roads, or explain why they could not be reduced. This is not to say the Forest Service never internally answered these questions. Indeed, the factual background – set forth above – shows that the Forest Service was very active in meeting with AIMMCO and expressing concerns. While the plaintiffs argue that the Forest Service just "caved in" to AIMMCO after getting the June 2009 letter, the Court disagrees. The record set forth above shows that the Forest Service met frequently with AIMMCO after that letter, eventually convincing AIMMCO to reduce the drill pads from 13 to 11 and to house workers off-site, among other concessions.

But whatever calculus the Forest Service engaged in to conclude internally that AIMMCO's project reduced impacts to their minimum was not shared with the public in any written analysis. That violates NEPA:

> Congress wanted each federal agency spearheading a major federal project
> to put on the table, for the deciding agency's and for the public's view, a
> sufficiently detailed statement of environmental impacts and alternatives so

as to permit informed decision making. The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm.

*Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir.2005); 40 C.F.R. §§ 1500.1(b);

The transparency that NEPA requires was ignored when AIMMCO and the Forest Service held a confidential meeting in Twin Falls, as discussed above. At that meeting, AIMMCO concedes that it presented evidence important to the approval of its plan: "[We] presented confidential and proprietary results from its geochemical sampling, which provided further evidence of the existence and location of the inferred mineralized bodies extending through Claims 1 and 2." *See AIMMCO's Statement of Undisputed Facts (Dkt. No. 24-2)* at ¶ 21. The Forest Service confirms this account: "[AIMMCO] presented a summary of geologic mapping and geochemical anomalies it has detected mostly through recently collected soil samples near the northeast corner of claim 2 and the east half of claim 1." *See FS6548.*

Under NEPA, the agency cannot rely on material that is kept secret from the public. *Lands Council, supra.* So the agency either must explain that it did not rely on this confidential information or, if it did rely upon it, describe the information and how it affected the agency's decision. But the agency did neither in the EIS and ROD. Thus, the Forest Service's decision is arbitrary and capricious because it may have relied on information withheld from the public.

The agency's decision violates NEPA for another reason – the failure to explain its conclusions. There is no doubt that the Forest Service concluded that the 11 drill sites

and 3 trenches were the minimum activity necessary for AIMMCO to prepare for its validity hearing. *See* FS81960 (ROD) (concluding that "[m]y decision . . . has been determined to be the minimum necessary . . . considering the [mining] rights in the project area . . . ."). But the agency's analysis – its reasoning that led to that conclusion – is not to be found in this record. It is this lack of analysis that violates NEPA. The Court will therefore remand this portion of the case to the Forest Service to prepare a supplemental EIS that (1) contains the reasons why it concluded that the 11 drills sites and 3 trenches were the minimum activity necessary for AIMMCO to prepare for its validity hearing; and (2) explains whether it relied on the information provided by AIMMCO at the confidential Twin Falls meeting and, if so, describes the nature of that evidence.[4]

### Motorized Vehicle Trips

The Court turns next to the agency's evaluation of the motorized vehicle trips. Here, the Forest Service did document its reasoning process for reducing AIMMCO's 771 planned trips to 571 trips. Originally, AIMMCO wanted to house the workers at the mining site, which would eliminate the need to transport workers by motorized vehicles each day but would cause substantial impacts related to the housing. The Forest Service determined that the motorized commuter trips were preferable to housing workers on site, and then evaluated how to reduce the motorized trips. Some trips could not be reduced

---

[4] AIMMCO's counsel asserted at oral argument that no agency should be empowered to direct a mining company where to place its drilling rigs. The Court is not granting to the Forest Service that power. Instead, the Court is implementing NEPA's requirement that the agency reveal its reasoning.

because supplies and heavy equipment had to be transported by motorized vehicles.  But

the workers' commuter trips were a possible source of reduction.  In the EIS, the Forest

Service considered requiring the workers to commute by pack animal or by walking the 3

to 3.5 miles from their housing (outside the wilderness area) to the mining claims:

> Potential effects to wilderness character of requiring stock use instead of motorized use for travel to slightly reduce the number of motorized intrusions to and from the site for shift changes was looked at in regards to the four tangible qualities of wilderness.  Using stock for travel to and from the site in lieu of motor vehicle would still not eliminate the need for motor vehicle transport during the project life and this motorized use would continue to impact the qualities of wilderness.  Since motorized use would still be necessary, the road maintenance required to facilitate the operations would still be necessary.  Using non-mechanized means to conduct operations would potentially lengthen the overall project duration and extend the impacts to wilderness character.  It is not possible to quantify the actual increase in duration but the nature of this travel is slower and throughout an operating season situations normally arise where motorized access would lessen downtime.  This alternative would potentially have greater impact on the wilderness quality of solitude or primitive and unconfined type of recreation because of the assumed additional time it would take to accomplish the project.  The additional time required to walk or ride would likely result in three shift day thereby further impacting solitude at more frequent intervals than a two shift day.  Repeatedly using stock to carry gear supplies and workers to the site also could present a safety issue for the stock with the large objects required at the site on daily basis and would require night time operations of stock.  The use of large quantities of stock would impact the trail similar to motorized use except for the width of impact and would still require the same level of road maintenance to get ingress/egress for other equipment.  Holding areas needed within the wilderness while freight is offloaded reloaded and crews transfer from shift to shift would result in disturbance and associated impacts to wilderness character.  Stock pens would be needed immediately outside the wilderness and result in additional soil disturbance water needs and the trips to supply feed.  The use of stock would not reduce the impacts to the pristine nature (naturalness and untrammeled) of the wilderness since all other impacts would still occur to get needed equipment into the site and stock could create additional impacts.  Outside of solitude the use of stock would not reduce any impacts to wilderness character and could add to impacts from high levels of stock usage.  Stock and walking are marginally quieter than motorized equipment

however solitude would still be impacted and increased due to more daily shift changes and overall project duration. This additional impact to wilderness quality was gauged to be significant enough to warrant dropping this alternative from in-depth analysis. The interdisciplinary team believed after comparing the advantages and disadvantages of non-motorized access that the best way to minimize the effects to wilderness character is to minimize the time necessary to complete the project. Because there was no clear benefit to wilderness character with this alternative it was dropped from in-depth analysis.

*See* FS80425-26. In this passage, the Forest Service thoroughly analyzes the use of stock instead of vehicles. Because the use of stock comes with its own set of impacts, and would lengthen the duration of the mining project, the Forest Service reasoned that using vehicles is less damaging to wilderness values. The Court cannot find that decision to be arbitrary or capricious.

But what about having workers walk to the site rather than be transported by motorized vehicles? This option would, according to the Forest Service, result in the need for a three-shift day instead of a two-shift day and lengthen the duration of the mining project. The trip is about 3 to 3.5 miles, and requires an elevation gain of at least 1,000 feet to get over Pueblo Summit, whether the workers are going or returning from their shift. *See* FS80390, 81976. Add unpredictable weather to this terrain and it is not arbitrary for the Forest Service to conclude, as it did, that "the nature of this travel is slower and throughout an operating season situations normally arise where motorized access would lessen downtime." *See* FS80425.

Plaintiffs complain, however, that the Forest Service was wrong in concluding that banning motorized commutes for the workers would only "slightly reduce the number of

motorized intrusions." *See* FS80425. In fact, banning motorized commutes would reduce total trips by 400, a substantial reduction.[5]

Thus, the Forest Service erred in estimating that banning motorized commutes would only "slightly reduce" the number of motorized trips. That error could have affected its ultimate conclusion that "there is no clear benefit to wilderness character" from requiring workers to walk to the site rather than be transported by motorized vehicle.

The Court therefore finds further that the EIS and ROD violate the Wilderness Act and NFMA because the Forest Service did not take into account the potential reduction of 400 motorized trips by having workers walk to work, rendering arbitrary the finding that 571 trips was an essential amount necessary for AIMMCO's assessment work. The Court will therefore remand this portion of the decision to the Forest Service with instructions to determine whether their analysis in § 2.3.5 of the EIS changes if they assume that walking to work reduces total motorized trips by 400.

## Alternatives

NEPA requires an EIS to describe and analyze "every reasonable alternative within the range dictated by the nature and scope of the proposal." *Alaska Survival v. Surface Transp. Bd.,* 705 F.3d 1073, 1087 (9th Cir. 2013). Consideration of alternatives "is the heart of the [EIS]," and agencies should "[r]igorously explore and objectively

---

[5] AIMMCO needs to make two trips a day using two vehicles for each trip to transport workers to the site and back. *See* FS80438. Given that an operating season is roughly July through October, this adds up to about 400 trips per operating season. *See* FS80478.

evaluate all reasonable alternatives" that relate to the purposes of the project and briefly discuss the reasons for eliminating any alternatives from detailed study. *Id.;* 40 C.F.R. § 1502.14. "The [EIS] need not consider an infinite range of alternatives, only reasonable or feasible ones." *Id.* But failure to examine a reasonable alternative renders an EIS inadequate. *Id.*

The EIS considered a no-action alternative, but it was never a serious option because it would have precluded AIMMCO from doing any work, thereby violating the 1872 Mining Act. The other two alternatives – Alternatives B & C – contained an identical number of drilling pads, trenches, and roads. Alternative C did reduce the motorized vehicle trips by 200, but the EIS itself concluded that "[t]here is really no pragmatic or substantially identifiable difference" between Alternative B and C. *See* FS80479-80.

No alternative discussed a reduction in drilling pads, trenches, and roads while still allowing AIMMCO to do its assessment work. This is probably why the Forest Service failed to explain its conclusion that it was approving the "minimum necessary" activities – if an alternative had actually proposed a reduction in drilling pads and trenches, the Forest Service would have been forced to explain why it was rejecting that alternative. So this lack of alternatives is directly related to the Court's earlier discussion of the agency's failure to explain its conclusions.

NEPA requires that either the Forest Service explain its conclusion that it was approving the "minimum necessary" activities or pursue an evaluation of an "Alternative D" that reduces the drilling pads, trenches, and/or roads while still allowing AIMMCO to

do assessment work.  The Court will remand this case to the Forest Service for that purpose.

**Riparian Conservation Areas**

Plaintiffs argue that the Forest Service's ROD violates NFMA because it approves mining activities inside Riparian Conservation Areas (RCAs).  NFMA requires agencies to ensure that their actions – including authorizing mining – are consistent with the applicable Forest Plan for each National Forest.  *See* 16 U.S.C. § 1604(i).  The Payette National Forest Plan has two standards that apply here.  *See* MIST08 & MIST09 at FS000138-39.  The first standard, MIST08, requires the mining company to "[l]ocate new structures, support facilities, and roads outside RCAs.  Where no alternative to siting facilities in RCAs exists, locate and construct the facilities in ways that avoid or minimize degrading effects to RCAs and streams."  The second standard, MIST09, directs the Forest Service to "[p]rohibit solid and sanitary waste facilities in RCAs," and "if no alternative to locating mine waste (waste rock, spent ore, tailing) facilities in RCAs exists then . . . [l]ocate and design waste facilities . . . to ensure mass stability and prevent the release of acid or toxic materials."  *Id.*

Here, certain portions of the approved mining plan are located in RCAs.  The EIS notes that 0.7 miles of reconstructed road (ultimately approved in the ROD) would be located in an RCA.  *See* FS80498.  In addition, the ROD authorizes trenches in the RCAs.  *See* FS81976.

The Forest Service evaluated both of these activities in light of MIST08 and concluded that there was no alternative to the siting of both.  *See* FS 28789 & FS28845.

The agency reasoned that moving the 0.7 miles of road reconstruction outside of the RCA would move it from an old existing roadbed to a previously undisturbed region of the wilderness area, a net loss for wilderness values. *Id.*  With regard to the trenches, moving them outside of the RCAs would also move them from an existing roadbed to a previously undisturbed area, again producing a net loss for wilderness values. *Id.*  The Court cannot find that either decision is arbitrary.

The EIS also notes that all latrines are located outside of RCAs except for the latrine at the Golden Hand mine site. *See* FS80501.  But the EIS discusses the various steps taken to protect the land and water from contamination from this latrine: (1) the latrine will be "located as far away from stream channels as possible"; (2) the latrine will be a "small capacity sealable latrine" that will "insure that the contamination of streams [will] not occur"; and (3) the "[g]ray water would be disposed of outside of RCAs and therefore would not likely reach streams." *See* FS80501-02.  The Forest Service therefore decided that no alternative to siting this latrine existed and that protections were in place to "prevent the release of acid or toxic materials" as required by MST09.  The Court cannot find this decision arbitrary.

The plaintiffs raised a question whether the drill pads were actually outside of the RCAs.  But the Forest Service has concluded that all drill pads are outside the RCAs and no contrary evidence exists. *See* FS28845 (statement by Payette Forest Geologist that "[a]ll proposed drill pads are located outside of RCAs").

For all of these reasons, the Court finds that plaintiffs' motion for summary judgment on the RCA issue will be denied and the defendants' motion will be granted.

**Conclusion**

The Court will therefore grant in part plaintiffs' motion for summary judgment. The Court finds, as a matter of law, that the EIS and ROD violate NEPA because (1) they fail to explain why the Forest Service concluded 11 drills sites and 3 trenches were the minimum activity necessary for AIMMCO to prepare for its validity hearing; (2) they fail to consider alternatives that would have reduced the drilling, trenching and road reconstruction but still allowed AIMMCO to do its necessary assessment work; and (3) they fail to explain whether the agency relied on the information provided by AIMMCO at the confidential Twin Falls meeting and, if so, they fail to describe the nature of that evidence.

The Court finds further that the EIS and ROD violate the Wilderness Act and NFMA because the Forest Service did not take into account the potential reduction of 400 motorized trips by having workers walk to work, rendering arbitrary the finding that 571 trips was an essential amount necessary for AIMMCO's assessment work.

The Court will deny plaintiffs' motion, and grant defendants' motions, finding as a matter of law that the EIS and ROD did not violate NFMA by improperly placing activities within the RCAs.

Based on these findings, the Court will declare the ROD and the work it authorizes as invalid, and will remand this case to the Forest Service to:

(1) Either explain why it concluded that 11 drills sites, 4 miles of reconstructed roads, and 3 trenches were the minimum activity necessary for AIMMCO to prepare for its validity hearing or consider an Alternative D that reduces the drilling, trenching

and road reconstruction but still allows AIMMCO to do its necessary assessment work;

(2) Explain whether the agency relied on the information provided by AIMMCO at the confidential Twin Falls meeting and, if so, describe the nature of that evidence and how it affected the agency's decision;

(3) Estimate how many motorized vehicle trips would be saved by having workers walk to work instead of being transported by motorized vehicles, and then explain whether those saved trips would change the analysis in § 2.3.5 of the EIS.

The Court will prepare a separate Judgment as required by Rule 58(a).

DATED: August 2, 2016

B. Lynn Winmill
Chief Judge
United States District Court